**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **E-RATE CONSULTING, INC.,** | : | |
| | : | |
| **Plaintiffs,** | : | **OPINION** |
| | : | |
| **v.** | : | **Civ. No. 04-5258 (WHW)** |
| | : | |
| **HARRISBURG SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Walls, District Judge**

Plaintiff E-Rate Consulting and defendant Harrisburg School District have filed cross-motion for summary judgment.  Pursuant to Fed. R. Civ. P. 78, the motions are decided without oral arguments.   The parties' motions for summary judgment are granted in part and denied in part in accord with this opinion.

## I. Facts and Procedural Background

### A. Parties

Plaintiff E-Rate Consulting, Inc. ("ERC") is a New Jersey corporation.  Its principal place of business is in Fairfield, New Jersey.  ERC provides consulting services to schools seeking government discounts for telecommunications and internet connections under the Schools and Libraries Program of the Universal Service Fund (the "E-Rate Program").  The Telecommunications Act of 1996 established the E-Rate Program, which is administered by the Universal Service Administrative Company under the direction of the Federal Communications

NOT FOR PUBLICATION

Commission.  The Program is funded by a Universal Service fee charged to telecommunications companies.

Defendant Harrisburg School District ("HSD") is a Pennsylvania municipal body, with its principal place of business in Harrisburg, Pennsylvania.  Before December 2000, a board of school directors (the "HSD Board of School Directors") ran the school district.  In December 2000, Harrisburg's mayor appointed a five-member board of control (the "HSD Board of Control") to oversee HSD, pursuant to Pennsylvania's newly-passed Education Empowerment Act.  (Def.'s Mot. Reed Decl. ¶ 4.)  See 24 Pa. Cons. Stat. Ann. § 17-1707-B(a1).  The Education Empowerment Act authorizes alternative methods for administering distressed school districts. See 24 Pa. Cons. Stat. Ann. § 17-1701-B, et seq.

**B. The Agreements**

Between 2000 and 2003, HSD and ERC entered into three agreements directed toward obtaining funding during the fourth, fifth, and sixth funding years of the E-Rate Program.  This opinion will refer to those  agreements as the "Year Four Agreement" (entered in December 2000), the "Year Five Agreement" (entered in December 2001), and the "Year Six Agreement" (entered on October 20, 2003).  (Compl. Exs. A, B, C.)  Under these agreements, ERC was to assist HSD by preparing applications for obtaining E-Rate Program funds.  In return, HSD was to pay ERC a percentage of the funds it received from the E-Rate Program.  This percentage varied from agreement to agreement.

The current litigation concerns only the Year Five and Six Agreements.  HSD paid ERC's fees under the Year Four Agreement, (Compl. ¶ 13), but did not fulfill its alleged obligations

2

**NOT FOR PUBLICATION**

under the Year Five and Six Agreements.  (Compl. ¶¶ 27, 38.)  HSD refutes ERC's claim that it

has not met its obligations to ERC and asserts that the Year Five and Six Agreements are invalid.

(See Answer ¶¶ 9-43.)

### 1. Year Four Agreement[1]

On January 12, 2001, after the mayor had appointed the HSD Board of Control, ERC and

HSD negotiated and entered the Year Four Agreement in Pennsylvania.  (Pl.'s Opp'n Gallo

Cert'n Ex. A ¶ 6.)  Four persons signed the Year Four Agreement for HSD, including Trent

Hargrove, the HSD Board of Control Chairman. (See Compl. Ex. A at 6.)[2]  Vincent LaForgia, the

Co-President of ERC, signed the Year Four Agreement for ERC.

Under the Year Four Agreement, HSD was to pay ERC 4% of all amounts funded

through the E-Rate Program.  HSD received funding commitments totaling over $19 million, and

HSD paid ERC a fee of $770,363.56.

### 2. Year Five Agreement

ERC prepared the Year Five Agreement in New Jersey, where it was signed by Vincent

LaForgia on December 12, 2001.  (Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 7; Compl. Ex. B.)  ERC then

sent the agreement to Pennsylvania, where William Gretton, HSD's Business Administrator,

signed it on January 16, 2002 by.  (Def.'s Opp'n Gretton Decl. ¶ 7.)   HSD then mailed the

---

[1]Information relating to the Year Four Agreement is provided only for background.

[2]In a January 8, 2001 letter to Mr. LaForgia, Nathan H. Waters, Jr., the Chief Legal
Officer of HSD, identified Trent Hargrove as the "Board of Control Chairman."  (See Def.'s
Reply Waters Decl. Attach. A.)  The Year Four Agreement was also signed by Brenda Conner,
the HSD Chief Financial and Operating Officer, attested to by Quetrina L. Sims, the Acting
Secretary of the HSD Board of Control, and approved by Mr. Waters.  (See Compl. Ex. A.)

NOT FOR PUBLICATION

signed agreement to ERC in New Jersey.  (Def's Reply Ex. ¶ 5; Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 7.)

In an affidavit, Vincent LaForgia states that the former HSD Director of Information Technology, John Weaver, told Mr. LaForgia that the "appropriate people" had executed the Year Five Agreement, and that the "Board" had approved it.  (Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 9.)   HSD disputes ERC's claim that any member of, let alone a majority of, the HSD Board of Control approved the Year Five Agreement.  (Def.'s Reply at 11.)

Under the Year Five Agreement, HSD was to pay ERC 2.38% of the E-Rate funding it received.  ERC prepared three E-Rate funding applications under the Year Five Agreement.  The three application resulted in over $10 million in funding for HSD.  HSD paid to ERC the fees arising from two Year Five Agreement applications.  HSD received almost $4 million in funding commitments, and paid ERC $91,852.58.

In a letter dated November 17, 2003, the HSD's Superintendent, Gerald W. Kohn, terminated the relationship between the two parties, effective immediately.  (Pl.'s Mot. LaForgia Aff. Ex. F.)  In December 2003, ERC issued HSD an invoice for $168,515.64.  This represented fees arising from the third application ERC had prepared that year, which allegedly yielded E-Rate funding commitments of $7,117,152.89.  (Pl.'s Mot. LaForgia Aff. ¶ 39.)  HSD did not pay ERC the invoiced amount, and ERC now claims that HSD owes it $169,338.24 (2.38% of $7,117,152.89) in fees under the Year Five Agreement.  Id. ¶¶ 41, 47.

### 3. Year Six Agreement

ERC prepared the Year Six Agreement in New Jersey.  Vincent Laforgia signed it here on

4

NOT FOR PUBLICATION

September 3, 2003.  (Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 7; Compl. Ex. C.)  William Gretton

signed it for HSD in Pennsylvania on October 21, 2003, and mailed the agreement back to ERC

in New Jersey.  (Def.'s Opp'n Gretton Decl. ¶ 7; Def.'s Reply Ex. ¶ 5.)  Mr. LaForgia alleges

John Weaver had told him the Year Six Agreement had also been executed by the "appropriate

people" and was approved by the "Board."  (Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 9.)  HSD concedes

that a majority of the HSD Board of Control had approved the Year Six Agreement, (Def.'s Mot.

Gretton Decl. ¶ 11), but denies that any member of the HSD Board of Control signed the

agreement.  (Def.'s Reply at 11.)  Under the Year Six Agreement, HSD was to pay ERC 2.38%

of all amounts funded through the E-Rate Program.

ERC claims that it prepared three applications for E-Rate Program funding under the

Year Six Agreement.  After HSD cancelled the Year Six Agreement in November 2003, HSD

unilaterally withdrew some of the applications that ERC had submitted.  ERC alleges the

remaining applications led to HSD being awarded over $728,126.94 in E-Rate Program funding

for Year Six.  HSD did not pay the fees it was obligated under the agreement, amounting to

$17,329.42.  (Pl.'s Mot. LaForgia Aff. ¶ 47.)

### C. The Present Litigation

ERC filed a complaint in the District Court of New Jersey in October 2004, alleging three

counts: breach of contract, unjust enrichment, and breach of the implied covenant of good faith

and fair dealing.[3]  ERC seeks $174,715.95 in damages and other relief for HSD's breach of the

---

[3]ERC supports its third count, HSD's breach of the implied covenant, by alleging that
HSD resubmitted the withdrawn Year Six applications for E-Rate funding year seven.
(Complaint ¶¶ 62-66.)  ERC claims that HSD received funding from those resubmitted

NOT FOR PUBLICATION

Year Five and Year Six Agreements.  (Compl. ¶ 44-55.)  ERC's unjust enrichment claim seeks

HSD to disgorge benefits it received from ERC's performance under the Year Five and Six

Agreements, as well as other relief.  Id. ¶ 56-61.

In December 2004, HSD filed its answer to ERC's complaint, which included several

counterclaims.  HSD's counterclaims allege that as a result of ERC's negligence and breach of

contract, HSD suffered harms amounting it quantifies to at least $54,020.20.  (Def.'s Opp'n at

26.)

In May of 2006, the parties filed the present motions for summary judgment.  HSD asks

the Court to dismiss all of ERC's claims, and to grant its counterclaims.  ERC asks the Court to

grant all its claims, and to dismiss HSD's counterclaims.

## II. Legal Standard for Summary Judgment

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  Only a genuine and material factual dispute between the parties will defeat

---

applications.   The only basis for ERC's assertion that HSD resubmitted the withdrawn
applications is its affiant's "information and belief." (Pl.'s Mot. LaForgia Aff. ¶¶ 33-34.)
However, mere assertions of belief cannot be used to meet a party's factual burden on summary
judgment:
> Rule 56(e) further limits the matter to be properly included in an affidavit to facts, and the
> facts introduced must be alleged on personal knowledge. Thus, ultimate or conclusory
> facts and conclusions of law, as well as statements made on belief or 'on information and
> belief,' cannot be utilized on a summary-judgment motion.

10B Wright & Miller, Federal Practice and Procedure § 2738 (1998).  See Olympic Junior, Inc.
v. David Crystal, Inc.,  463 F.2d 1141, 1146 (3d Cir. 1972); DiGiorgio Corp. v. Mendez & Co.,
230 F. Supp. 2d 552, 561 (D.N.J. 2002).  For this reason, ERC's third count cannot survive
summary judgment and will not be discussed further.

NOT FOR PUBLICATION

a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could find for the non-movant on that issue.  It is material if, under the substantive law, that issue would affect the outcome of the suit. See id. at 248.

A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex v. Catrett, 477 U.S. 317, 323 (1986).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]" that show that there is no genuine material issue of fact as to the non-existence of that element.  Id. at 323. When the burden of proof for a particular factual element falls on the non-moving party, the moving party must initially demonstrate that the non-moving party cannot meet its burden with the evidentiary material of record admissible at trial.  See id. at 322-23.

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).

7

NOT FOR PUBLICATION

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In so doing, the court must construe the facts and inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

## III. Analysis

### A. ERC's Claims

The parties' dispute centers on the validity of the Year Five and Year Six Agreements. HSD claims that the Court must award it summary judgment because the contracts are invalid and unenforceable.  HSD argues that school districts must observe certain contractual formalities--approval by a majority of the board and execution by board officers--to form valid contracts under Pennsylvania law.  ERC responds that HSD's motion for summary judgment must be denied because the contracts are valid under New Jersey and Pennsylvania law.  The Court will first determine which state's law governs the contracts' formation.

#### 1. True Conflict Between Results Under Pennsylvania and New Jersey Law

The Court will first determine if a true conflict exists.  If the result is the same under New Jersey and Pennsylvania law, no conflict of law analysis is necessary.  See Huber v. Taylor, -- F.3d --, 2006 WL 3071384, *5 (3d Cir. October 31, 2006).  ERC argues that under both states' law the Year Five and Six Agreements are valid contracts.  In this view, there is no true conflict and the court does not need to perform a conflict of law analysis.

HSD asserts that it will prevail under Pennsylvania law, because the Agreements are

**NOT FOR PUBLICATION**

invalid under that law.  HSD does not contest the contracts' validity under New Jersey law.

Therefore, the Court assumes that HSD could not win its motion for summary judgment under

New Jersey law.  Only if HSD prevails under Pennsylvania law does a true conflict exist, and a

conflict of law analysis is necessary.

### a. Formalities Required for Contracts Made by Board of School Directors

HSD argues that the Year Five and Six Agreements are invalid because they do not

conform to two Pennsylvania statutory provisions--24 Pa. Cons. Stat. Ann. § 5-508 and 24 Pa.

Cons. Stat. Ann. § 4-427--that require certain formalities contracts with school districts.

However, these statutory provisions apply to *boards of school directors*, and the HSD

*Board of Control* governed the school district when the agreements were executed.  Accordingly,

HSD will prevail under Pennsylvania law--and the court will engage in a conflict of law analysis-

-only if the same requirements apply to boards of control.

### I. Approval By Majority Vote

24 Pa. Cons. Stat. Ann. § 5-508 mandates that boards of school directors in Pennsylvania

ratify their representatives' decision to enter significant contracts.  Section 5-508 reads:

> The affirmative vote of a majority of all the members of the board of school directors in
> every school district, duly recorded, showing how each member voted, shall be required
> in order to take action on the following subjects:--
> > [. . .]
> Entering into contracts of any kind, including contracts for the purchase of fuel or
> any supplies, where the amount involved exceeds one hundred dollars ($100).
> > [. . .]

9

**NOT FOR PUBLICATION**

> Failure to comply with the provisions of this section shall render such acts of the board of school directors void and unenforcible.

24 Pa. Cons. Stat. Ann. § 5-508.  Relying on this statute, Pennsylvania courts have voided

numerous contracts between Pennsylvania contractors and school districts.  See Albert Gallatin

Area School Dist. v. Penn Transp. Servs., Inc., 704 A.2d 184, 185 (Pa. Cmwlth. Ct. 1997);

Hazleton Area School Dist. v. Krasnoff,  672 A.2d 858, 863 (Pa. Cmwlth. Ct. 1996); Grippo v.

Dunmore School Bd., 365 A.2d 678, 679 (Pa. Cmwlth. Ct. 1976); School Dist. of Philadelphia v.

Framlau Corp., 328 A.2d 866, 871 (Pa. Cmwlth. Ct. 1974).

### ii. Execution by President and Secretary of Board

24 Pa. Cons. Stat. Ann. § 4-427 directs that the president and secretary of a board of

school directors execute all contracts.  Section 4-427 reads:

> The president shall be the executive officer of the board of school directors, and as such he, together with the secretary, when directed by the board, shall execute any and all deeds, contracts, warrants to tax collectors, reports, and other papers pertaining to the business of the board, requiring the signature of the president.

24 Pa. Cons. Stat. Ann. § 4-427.  These formalities must be observed for a contract to bind a

school district.  See Chilli v. McKeesport School District, 6 A.2d 99, 100 (Pa. 1939) (comparing

execution requirement to requirements that contract be written and approved by majority of

board); Wayne Crouse, Inc. v. School Dist. of Borough of Braddock, 19 A.2d 843, 844 (Pa.

1941).

### b. Applicability of These Formalities to Contracts Made Under by Boards of Control

NOT FOR PUBLICATION

HSD asserts the Year Five and Six Agreements are invalid because they do not comply with these statutory provisions.  Both agreements were signed by HSD's Business Administrator, not the Board of Control's Chairman--the equivalent of the president of a board of school directors.  The Board of Control's majority did not approve the Year Five Agreement.[4]

However, as mentioned, 24 Pa. Cons. Stat. Ann. § 5-508 and 24 Pa. Cons. Stat. Ann. § 4-427 concern boards of school directors.  HSD argues that the laws governing boards of control imply that these two provisions also apply to boards of control.

### i. Statutory Provisions Governing Boards of Control

The Pennsylvania Education Empowerment Act empowers mayors of certain failing urban school districts to appoint boards of control:

> (b) A board of control in an education empowerment district certified under this section shall consist of five (5) residents of the school district who shall be appointed by the mayor of the coterminous city within fourteen (14) days of the certification of the school district as an education empowerment district. Members of the board of control shall serve at the pleasure of the mayor.

24 Pa. Cons. Stat. Ann. § 17-1707-B(b).  The mayor of Harrisburg exercised this statutory power in January 2001.  The Education Empowerment Act contains a general grant of powers and duties to mayorally-appointed boards of control:

> (c) The authority granted to a board of school directors under section 1704- B(a) shall be exercised by the board of control of an education empowerment district certified under

---

[4]HSD concedes that the majority of the Board of Control approved the Year Six Agreement.  The evidentiary basis for HSD's concession is unclear.  See infra p. 15.

this section. The provisions of sections 1705-B(c), (d), (e) and (g), 1706-B and 1708-B(a) shall be applicable to a board of control appointed under subsection (b). The provisions of sections 693, 694 and 695 relating to special boards of control shall apply to a board of control under this section.

24 Pa. Cons. Stat. Ann. § 17-1707-B(c).

24 Pa. Cons. Stat. Ann. § 17-1707-B(c) references three provisions that are relevant here.

24 Pa. Cons. Stat. Ann. § 17-1705-B(g) reads:

(g) Actions of the board of control shall be by a majority vote. A majority of the members appointed shall constitute a quorum.

24 Pa. Cons. Stat. Ann. § 17-1706-B(a) reads:

(a) Except for the power to levy taxes, the board of control may exercise all other powers and duties conferred by law on the board of school directors and the powers and duties conferred by law on a special board of control under sections 693, 694 and 695.  In addition to the powers set forth in section 1704-B(a), the board of control shall have the power to close a district school.

24 Pa. Cons. Stat. Ann. § 6-693 reads:

When the special board of control assumes control of a distressed school district, it shall have power and is hereby authorized to exercise all the rights, powers, privileges, prerogatives and duties imposed or conferred by law on the board of school directors of the distressed district, and the board of school directors shall have no power to act without the approval of the special board of control.

The powers and duties of a board of control are generally equivalent to those of a board of school directors (excepting the power to levy taxes).  This implies that the 24 Pa. Cons. Stat. Ann. § 5-508 and 24 Pa. Cons. Stat. Ann. § 4-427 requirements apply to boards of control formed pursuant to 24 Pa. Cons. Stat. Ann. § 17-1707-B.

12

NOT FOR PUBLICATION

### ii. Approval By Majority Vote

The Court finds that a board of control must approve any contract by majority vote under Pennsylvania law.  A school district governed by a board of control may enter into a contract in two ways.  First, a majority of the board of control may approve the decision of a board of school directors to enter into a contract.  See 24 Pa. Cons. Stat. Ann. § 6-693.  Second, the board of control may enter into a contract on its own, because a "board of control may exercise all other powers and duties conferred by law on the board of school directors."  24 Pa. Cons. Stat. Ann. § 17-1706-B(a).  If a board of control decides to enter into a contract it may do so only after taking a majority vote pursuant to 24 Pa. Cons. Stat. Ann. § 17-1705-B(g).[5]  This is apparently what happened with respect to the Year Four Agreement, which--as Mr. Waters informed Mr. LaForgia in January 2001--was "board approved on December 13, 2000."  (Def.'s Reply Waters Decl. Attach. A.)

In contrast, HSD has shown that no evidence in the record tends to prove the Year Five Agreement was approved by the majority of the Board of Control.  William Gretton states that his diligent review of the Board of Control Minutes revealed no evidence the Board approved the

---

[5]When a board of control enters into a contract it exercises a specific power of a board of school directors.  It is reasonable to assume that the board of control must also fulfill corresponding statutory duties--i.e. the 24 Pa. Cons. Stat. Ann. § 5-508 board of school directors duty to approve by majority vote any contract over $300.  Such a reading of the provisions of the provisions governing boards of control is in accordance with the textual canon of *in pari materia* and avoids the legally absurd result of the provisions of the Education Empowerment Act being less restrictive than the other parallel provisions the Public School Act.  See infra p. 15-16.

**NOT FOR PUBLICATION**

Year Five Agreement.  (Def.'s Mot. Gretton Decl. ¶¶ 9-10.)

Ifthere is no record that the board voted to approve the contract, the burden of proving

board approval under Pennsylvania law rests on the party asserting the contract's validity.

Hazleton, 672 A.2d at 862.  See Rudolph v. Gallatin School Dist., 431 A.2d 1171, 1772 (Pa.

Cmwlth. Ct. 1981).  ERC will not be able to meet this burden at trial, especially because

*Hazleton* requires parties asserting contract claims against school districts to "provide solid

proof" of majority approval.  See Hazleton, 672 A.2d at 862 n.7.

ERC's *only* evidence the Board of Control approved the Year Five Agreement is Vincent

LaForgia's assertion that an HSD employee told him that "the Year Five and Six Agreements

were approved by the 'Board'."  (Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 9.)  From this ERC would

infer from Mr. Laforgia's statement that the Board did *in fact* approve the contract.  Such

inferences based on second hand information cannot be used to meet evidentiary burdens on

motions for summary judgment.  See supra note 3; Newhouse v. Probert,  608 F. Supp. 978, 983

(D.C. Mich. 1985) (information that is not first hand and merely believed to be true cannot be

basis for defeating motion for summary judgment).  Armed with only this evidence, ERC cannot

prove at trial that the Board of Control approved the Year Five Agreement.[6]  There is no genuine

material issue of fact on this issue.

---

[6]ERC's argument that HSD's partial payment for services under the Year Five Agreement indicates that the Board of Control had approved the Agreement is specious because approval of payment is distinct from the initial approval of the Agreement itself.  (See Pl.'s Opp'n at 15.)

**NOT FOR PUBLICATION**

On the basis of Mr Gretton's review of the Board of Control Minutes, HSD concedes that the Board of Control approved the Year Six Contract.  Mr. Gretton states that the "Minutes of the Board of Control indicate that the alleged Year Six Agreement was approved by the Board on October 20, 2003."  (Def.'s Mot. Gretton Decl. ¶ 11.)  A jury could find that the Board approved the Year Six Agreement,[7] but this fact is ultimately immaterial because the Board of Control Chairman executed *neither* Agreement.

### iii. Execution by Board of Control Chairman

The Court finds the Year Five and Year Six Agreements invalid because the Chairman of the Board of Control did not sign them.  The Education Empowerment Act expressly incorporates portions of the Public School Code, and the two laws are *in pari materia* and so must be read together.  See 1 Pa. Cons. Stat. Ann. § 1932.  Therefore, the powers and responsibilities of the president of a board of school directors and the chairman of a board of control are analogous under Pennsylvania law.  If the president of a board of school directors must sign a school district contract for it to be valid, the chairman of a board of control must sign it also.

---

[7]Mr. Gretton's assertion is based on an entry in the Board of Control Minutes stating that "it is the recommendation of the Superintendent of Schools that the Board of Control approve the proposal from E-Rate Consultants for funding year six (2003-04)."  (Def.'s Mot. Gretton Decl. Attach. A at 6.)  Since Mr. Gretton's interpretation of this entry is not self-evident, it is uncertain whether ERC can show by "solid proof" that the HSD Board of Control approved the Year Six Agreement.

NOT FOR PUBLICATION

The Court's conclusion is supported by the purpose of the legislation creating the boards of control.  See 1 Pa. Cons. Stat. Ann. § 1922.  It would be legally absurd to construe the Education Empowerment Act as allowing subordinates greater independence than the Public School Code, because the Act is intended to increase oversight of a  distressed school district's academic standards and finances.  See 24 Pa. Cons. Stat. Ann. § 17-1701-B, et seq.; Harrisburg School Dist. v. Zogby, 828 A.2d 1079, 1081 (Pa. 2003).  The Court believes a Pennsylvania court would find 24 Pa. Cons. Stat. Ann. § 4-427 places the same burdens of oversight on members of boards of control as on members of boards of school directors.

HSD has submitted evidence proving the Year Five and Year Six Agreements were neither signed nor executed by the Chairman of the HSD Board of Control.  (See Compl. Exs. B, C.)  ERC's assertion that an HSD employee stated that the "Agreements were executed by the appropriate officials on behalf of HSD" is second-hand information that cannot counter the evidence produced by HSD.  (See Pl.'s Opp'n Gallo Cert'n Ex. A ¶ 9.)  See supra p. 14 and note 3.[8]  There is no genuine issue of fact here, and the Court finds the Year Five and Six Agreements are invalid under Pennsylvania law.

### c.  Unjust Enrichment

The Court finds ERC's cannot sustain its unjust enrichment claim under Pennsylvania

---

[8]Any potential estoppel effect of the employees' statement does not operate against school districts under Pennsylvania law.  See infra p. 17.

**NOT FOR PUBLICATION**

law.  If a contract is not approved by a school board, Pennsylvania courts will not allow the

plaintiff to recover from the school district on quantum meruit claims.  Hazleton, 672 A.2d at

862.  Pennsylvania rejects quantum meruit recovery because "the statute excludes all equities and

implied liabilities" if "statutory methods for the authorization of expenditures are not pursued."

Price v. School Dist. of Borough of Taylor, 42 A.2d 99, 102 (Pa. Super. Ct. 1945).  Pennsylvania

law dictates that ERC cannot recover on a quantum meruit claim because the contracts are

invalid.

### d. Estoppel

ERC also makes an estoppel argument.  It claims that, by continuing to provide

information to ERC after November 2003 and by partially paying ERC's fee under the Year Five

Agreement, HSD represented that the Year Five and Six Agreements were valid.  (Pl.'s Opp'n

13-16.)  The Court rejects ERC's argument that HSD's partial performance of the Agreements

estops the school district's claim that the contract is invalid.  Pennsylvania law does not

recognize estoppel here.  See Grippo, 365 A.2d at 679 (Partial payment of wages under

employment contract does "not estop the school district from defending against the contract or

amount to a ratification of the invalid contract"); Commonwealth ex rel. Ricapito v. Bethlehem

School Dist., 25 A.2d 786 (Pa. 1942).

### e. Conclusion: True Conflict Exists

The Court finds that under Pennsylvania law the agreements are invalid and no recovery

17

**NOT FOR PUBLICATION**

is available to ERC under its breach of contract, estoppel, or unjust enrichment theories.

There is a true conflict between the results under Pennsylvania and New Jersey law.  The Court will decide which state's law to apply when interpreting the contracts.

### 2. Choice of Law--Legal Standard

The Court applies New Jersey's choice of law rules because "a federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state."  Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994).  See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941); American Air Filter Co. v. McNichol, 527 F.2d 1297, 1299 n.4 (3d Cir.1975).

The Year Five and Year Six Agreements contain choice of law clauses stating that the Agreements "shall be governed by the laws of the State of New Jersey, except for its choice of law principles."  (Compl. Ex. B, C.)  If the Court determines that the choice of law clauses in the Agreements are invalid under New Jersey law rules, it will ignore them.

New Jersey Courts have endorsed the approach reflected in Section 187 of the Restatement (Second) of Conflict of Laws.  See Instructional Sys., Inc. v. Computer Curriculum Corp., 614 A.2d 124, 133 (N.J. 1992);  Kalman Floor Co., Inc. v. Jos. L. Muscarelle, Inc., 196 N.J. Super. 16, 21, 481 A.2d 553, 555-56 (N.J. Super. Ct. A.D. 1984).[9]  Under section 187 a

---

[9]The Third Circuit has determined that Pennsylvania courts follow Section 187 of the Restatement as well.  Kruzits,  40 F.3d at 55.  HSD's reliance on County of Butler v. Local 585 Employees Union, 744 A.2d 338 (Pa. 1999), is misplaced because it does not address a choice of

**NOT FOR PUBLICATION**

court will follow the law the parties select, unless certain exceptions apply:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187 (2006).  Here, the choice of law clauses fall squarely under the subsection 2 exception of section 187, because the issue of an employee's capacity to bind the school board is an "issue . . . which the parties could not have resolved by an explicit provision in their agreement to that issue."  See Restatement (Second) of Conflict of Laws, § 187 Comment (d); Joseph Perillo, Corbin on Contracts § 27.1 n.1 (Rev'd ed. 2002).  Mr. Gretton could not vest himself with the capacity to bind the school district to a contract without board approval.  See Restatement (Second) of Conflict of Laws, § 187 Comment (d).

### 3.  Choice of Law--Analysis

The choice of law provisions will be ineffective under section 187 if three conditions are met.  First, Pennsylvania's law governing board approval must reflect a fundamental policy of

---

law clause.  County of Butler's argument against bootstrapping would apply if the Court were construing another clause in the contracts, such as the Clause 2 of the Year 5 Agreement, which purports to give the "Client" the power to designate a representative with the power to sign contracts on its behalf.

**NOT FOR PUBLICATION**

that state.  Second, Pennsylvania must have a materially greater interest than New Jersey in the

determination of this particular issue.  Third, Pennsylvania law must govern the contract absent

any choice of law provision.  See Kramer v. Ciba-Geigy Corp., 854 A.2d 948, 959 (N.J. Super.

Ct. A.D. 2004) (three-prong Restatement test).  If the conditions are met, the Court will apply

Pennsylvania law as the default law.

### a. Fundamental Policy of Pennsylvania

The Court finds that applying New Jersey law will cause a result contrary to a

fundamental policy of Pennsylvania, because 24 Pa. Cons. Stat. Ann. § 5-508 and 24 Pa. Cons.

Stat. Ann. § 4-427 are provisions intended to help Pennsylvania implement significant budgetary

and educational policies.  These provisions are designed to increase oversight of education

related contracts and to foster accountability in government.

A Pennsylvania Court has articulated the policy underlying the predecessor (and

essentially similar) provisions of section 5-508 the Public School Act in the following way:

> The purpose and public policy behind these provisions of the School Code are to protect
> the school district from any possible collusion and dishonesty, and to insure that where
> material or supplies in an amount over $300 are purchased they will be obtained at the
> best possible price.

Commonwealth v. Zang, 16 A.2d 741, 744 (Pa. Super. Ct. 1940).  The Pennsylvania Supreme

Court has drawn a parallel between these provisions and statutory provisions requiring

competitive bidding for other government contracts.  In re Summit Hill School Directors, 102 A.

278, 279 (Pa. 1917).

20

**NOT FOR PUBLICATION**

The New Jersey Code espouses similar policies.  A New Jersey provision which requires competition and transparency in education related contracts demonstrates that similar fundamental policies motivate this state's legislators.  See 18A N.J. Stat. Ann. § 18A-37.  The New Jersey Commissioner of Education has voided contracts that failed to conform to the bidding process outlined by section 18A-37.  See Murphy Bus Serv. v. Bd. of Education of the Township of Lakewood, 1998 WL 34275753 (N.J. Comm'r of Education Aug. 28, 1998).

Though their methods are different, both states legislated to minimize waste and collusion when local school bodies award contracts.  Reducing government waste and corruption is surely a fundamental policy of any state.

### b. Pennsylvania Has a Materially Greater Interest in the Determination of this Particular Issue

When litigation involves a state's fundamental policy intended to protect citizens of that state, that state will usually have a materially greater interest.  Barton Press, Inc. v. Am. Environmental Intern., Inc. involved a transaction where the buyer was "a New Jersey citizen and the goods were delivered into New Jersey."  No. 94-79, 1995 WL 46353, at *7 (D.N.J. Jan. 31, 1995).  This situation clearly implicated New Jersey's Consumer Protection Act underlying policy to "protect buyers from unfair practices by sellers" because the buyer was from New Jersey.  Id.  On this basis, the district court concluded that "New Jersey ha[d] a materially greater interest in the transaction."  Id.

Here, the statute's policy is to protect Pennsylvania taxpayers and students by ensuring

21

**NOT FOR PUBLICATION**

that school districts do not waste money.  Though the statute does not involve these citizens, it does involve a Pennsylvania governmental unit, the school district.  Pennsylvania's policy of protecting its citizens as taxpayers and students makes its interest materially stronger than New Jersey's.

Generally, when a state governmental unit is a party to litigation, that state's interest is materially greater.  The Western District of Pennsylvania has noted that "Pennsylvania courts have recognized that when another state's agency or subdivision is a party to a lawsuit, that state has a heightened interest in the proceedings."  Lake Erie Inst. of Rehabilitation, Inc. v. Marion County, West Virginia Bd. of Education,  798 F. Supp. 262, 265-266 (W.D. Pa. 1992) (citing Flamer v. New Jersey Transit Bus Operations, 607 A.2d 260, 264 (Pa. Super. Ct. 1992).  In Lake Erie Institute, the District Court determined that the involvement of a West Virginia agency made Pennsylvania's interest "in ensuring the sanctity of contracts entered into by its citizens" appear "more modest."  798 F. Supp. at 266.  In Flamer, a Pennsylvania court found New Jersey had a materially greater interest in a dispute because--among other reasons--one of the parties was funded by New Jersey tax dollars.  607 A.2d at 264.

This Court finds that Pennsylvania has a materially greater interest in HSD's transactions with ERC because a Pennsylvania subdivision is party to the litigation and because the law at issue reflects Pennsylvania's interest in protecting its citizens.

### c. Pennsylvania Law is the Default Law under the Restatement Section 188 "Most Significant Relationship Test"

**NOT FOR PUBLICATION**

New Jersey has adopted the "most significant relationship" test to determine the law that should govern a contract by default.  See New Jersey Mfrs. Ins. Co. v. MacVicar, 704 A.2d 1343, 1346 (N.J. Super. Ct. A.D. 1998); State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 417 A.2d 488, 490-92 (N.J. 1980) (discussing transition from *lex loci contractus* to "most significant relationship test" in New Jersey); Restatement (Second) of Conflict of Laws § 188.  Nevertheless, as a practical matter, New Jersey applies the place of the contract rule unless another state has a dominant and significant relationship to the parties and the underlying issue:

> the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law. [. . .]  At the same time, this choice-of-law rule should not be given controlling or dispositive effect.  It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction.  That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.

State Farm, 417 A.2d at 492-93 (internal citations omitted).

The Court will evaluate whether Pennsylvania or New Jersey has a dominant and significant relationship to the parties and underlying transaction.  If neither state has such a relationship, then the Court will apply the place of the contract rule.

Section 188 of the Restatement outlines the "most significant relationship" test.  Five types of contacts are "to be taken into account" when a court determines which state's law is to be applied to a particular contractual issue: (a) the place of contracting, (b) the place of

23

**NOT FOR PUBLICATION**

negotiation, (c) the place of performance, (d) location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  See Restatement (Second) of Conflict of Laws § 188.

The place of contracting and negotiation and the place of performance are indeterminate for the Year Five and Six Agreements.  The parties to the contract are evenly split between Pennsylvania and New Jersey.  However, the location of the subject matter of the contracts-- telecommunications and internet access programs for Harrisburg schools--is clearly in Pennsylvania.

Section 188 provides a framework to determine the relative importance of contacts between the states, the parties, and the transaction(s) at issue.  Their relative importance determines how a court will weigh the policy factors identified by Restatement (Second) of Conflict of Laws § 6:

> (1) the needs of the interstate and international system, (2) the relevant policies of the forum, (3) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied.

State Farm, 417 A.2d at 491; See Restatement (Second) of Conflict of Laws § 6.

This dispute particularly implicates third section 6 factor. Section 188 analysis shows that Pennsylvania has a more significant contacts with the contracts because the subject matter of the agreements in located in that state.   Because the school contracts are in Pennsylvania, that state's

24

NOT FOR PUBLICATION

"relevant policy" of ratification by school boards is clearly engaged.  And the party most central

to that public policy, HSD, is located in Pennsylvania.  The Court finds Pennsylvania law

governs the contracts under section 188.

### d. Alternative Basis: Place of the Contract

If the Court were to determined that neither New Jersey nor Pennsylvania has a dominant

and significant relationship to the dispute, the Court would follow the traditional rule--the law of

the place of contracting.  Traditionally, when a contract is signed and mailed, the place of

contracting is "where the document is posted."  Restatement (First) of Conflict of Laws § 314

(1934).  See M. N. Axinn Co. v. Gibraltar Dev., Inc., 133 A.2d 341, 347 (N.J. Super. Ct. A.D.

1957) ("A contract arising from use of the mails is deemed to be entered into when the offeree

posts his acceptance."); Arco Welding & Mach. Works, Inc. v. Terry Contracting, Inc., 131 A.2d

316, 318 (N.J.  Super.  Ct. A.D. 1957); Northampton Mut. Live Stock Ins. Co. v. Tuttle, 40

N.J.L. 476, 479 (1878); Houghwout v. Boisaubin, 18 N.J. Eq. 315, 322 (Ch. Ct. 1867).[10]  Here

HSD accepted, signed, and mailed the contracts in Pennsylvania, and Pennsylvania law governs

under the traditional rule also.

### 4.  Conclusion

The Court finds that, under New Jersey's choice of law rules, Pennsylvania law applies.

---

[10]ERC's citation of <u>Joffe v. Bonn</u>, 14 F.2d 50, 52 (3d Cir. 1926), is misleading because it identifies the last act as "delivery."  Under New Jersey choice of law rules, the act of "delivery" is the executed contract's posting.  (<u>See</u> Pl.'s Opp'n at 4-5.)

**NOT FOR PUBLICATION**

HSD has demonstrated that no genuine material issue of fact exists which would allow a jury to find that a valid contract exists under Pennsylvania law.  The Court dismisses all ERC's claims.

### B. HSD's Counterclaims

#### 1. Breach of Contract

HSD can only recover on its breach of contract counterclaim if there were valid contracts for the fifth and/or sixth E-Rate funding years.  (See Countercl. ¶ 51.)  Because the Year Five and Six Agreements are invalid, HSD cannot recover on its contract counterclaim.

#### 2. Negligence

HSD also claims that ERC was negligent in its representations to telecommunication vendors.  (See Countercl. ¶¶ 6-48.)  HSD's theory must be one of negligent undertaking or negligent misrepresentation.  Under a negligent undertaking theory a plaintiff can only recover for "physical harm[s]."  See Restatement (Second) Torts § 323 (1965).  See Stupka v. Peoples Cab Co., 264 A.2d 373 (Pa. 1970) ("economic harm is not a basis for recovery" under section 323); Carlotti v. Employees of Gen. Elec. Fed. Credit Union No. 1161, 717 A.2d 564, 567 (Pa. Super. Ct. 1998).  HSD alleges pure economic harm, and cannot recover on a negligent undertaking theory.  (See Def.'s Opp'n at 26.)

A party can only be liable for negligent misrepresentation if it has a financial interest in the transaction.  See Restatement (Second) Torts § 552 (1965); Gibbs v. Ernst, 647 A.2d 882 (Pa. 1994); Busy Bee, Inc. v. Corestates Bank N.A.,  67 Pa. D. & C.4th 496, 529 (Ct. Com. Pl. 2004);

**NOT FOR PUBLICATION**

H. Rosenblum, Inc. v. Adler, 461 A.2d 138, 143 (N.J. 1983). ERC had no financial interest in the transaction because no valid contract existed.  It cannot be liable on a negligent misrepresentation theory.

**IV. CONCLUSION**

The Court dismisses all ERC claims and HSD counterclaims for the reasons stated.

It is on this 18th day of December, 2006:

ORDERED that Defendant HSD's motion for summary judgment with respect to ERC's claims is GRANTED;

ORDERED that Plaintiff ERC's motion for summary judgment with respect to HSD's counterclaims is GRANTED;

**s/ William H. Walls**

**United States Senior District Judge**

27